**GREAT LAKES EQUIPMENT COMPANY, Appellant,**

v.

**FLUID SYSTEMS, INCORPORATED, Appellee.**

No. 12082.

United States Court of Appeals, Sixth Circuit.

Decided Dec. 17, 1954.

See also 98 F.Supp. 220.

Bruce B. Krost, Cleveland, Ohio (George V. Woodling, Cleveland, Ohio, on the brief), for appellant.

Edmond M. Bartholow, New Haven, Conn. (Wm. E. Williams, Cleveland, Ohio, on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and STEWART, Circuit Judges.

ALLEN, Circuit Judge.

Plaintiff, the owner of U. S. Patent No. 2,224,403 issued to Harold A. Lines, December 10, 1940, on an application filed May 12, 1938, brought an action for infringement and injunction.[1] The claims in issue, 4, 14 and 15, are printed in the margin.[2]

The patent relates to "electrical heating of storage and transportation system of a viscous fluid." The specifications state the problem as follows:

"In the transportation or conduction of viscous liquids from a point of storage, for example, such as a tank, to a device adapted to use or ·receive the liquid, difficulty is often encountered not only in starting the flow due to the inherent resistance of the liquid to flow, but also in maintaining a steady and constant flow without the maintenance of an ex-

---

1. The parties will be denominated as in the court below.

2. 4. The method of transporting fuel oil or the like from a supply tank to a burner, comprising passing said oil in excess quantity through a pipe line from the tank to the burner and returning the excess to the tank, electrically heating the pipe line during transit of the oil from the tank to the burner and return, and delivering the excess heated oil to the tank at a point adjacent the pump inlet whereby heated oil is again drawn into the inlet without being diffused through the colder oil in the tank.

14. In a transportation system for viscous liquid, a supply tank, a device to which the liquid is to be transported from the tank, supply and return pipes of conducting material connecting said tank and device, the end of said supply pipe being immersed in the liquid in the tank, means to draw the liquid from the tank and deliver it to said device, means electrically connecting said pipes to form an electrical circuit and to pass a current therethrough to heat the pipes and the liquid therein, and the outlet of said return pipe being directed adjacent the inlet end of the supply pipe whereby the heated liquid returned to the tank is redrawn into the system without being diffused through the cold liquid in the tank.

15. In a transportation system for viscous liquid, a supply tank, a device to which the liquid is to be transported from the tank, supply and return pipes of conducting material connecting said tank and device, the end of said supply pipe being immersed in the liquid in the tank, means to draw the liquid from the tank and deliver it to said device, electrical means for heating said supply and return pipes to heat the liquid therein, and the outlet of the return pipe being located adjacent the inlet of the supply pipe whereby heated liquid discharged from the return pipe is redrawn into the system without being diffused through the colder liquid in the tank.

cessively high pressure. This is particularly true in the transportation of heavy fuel oils, for example, from a storage tank to a burner where the oil is to be used, and is of course also true in the transportation of other viscous liquids such as castor oil, molasses, etc."

The court found the claims in issue valid and infringed by defendant through the sale of an oil burning system installed at the plant of Pesco Products Division, Borg-Warner Corporation, at Bedford, Ohio, and issued an injunction. The court found that many parts of plaintiff's system as sold and installed are old equipment such as transformers, suction pumps, transportation pipes, heated for the purpose of reducing viscosity of material to be transported and for reducing friction and increasing flowability. The court said "some heating systems are disclosed of a seeming anticipatory character in their respective arts," but the court concluded that "this is a combination patent for transporting viscous oil, electrically heated, not an aggregation of such parts or elements as mentioned above, but constituting a unified system with novel characteristics not theretofore disclosed in the prior art giving the plaintiff's system an unusually new, and certainly a useful, economic means or method for successfully transporting heavy fuel oil from storage to burner with return of excess to storage."

Since heavy fuel oil is cheaper than lighter oil, methods of making heavy oils available for the heating of buildings, plants, etc., have recently assumed increasing importance. As heavy oil is viscous and tends to become non-pumpable with falling temperatures, the oil must be heated, not only in order to start the initial flow from tank to burner but also to maintain flowability throughout the operation. The Lines patent discloses a method and apparatus for electrically heating heavy oil, such as bunker C or No. 6, in transportation from a tank to an oil burner. The oil is heated by electric current passing through pipes which run between the tank and the burner,

setting up resistance and thus generating heat. An excess of oil is delivered to the burner in order to insure a sufficient supply and this excess of oil is returned to the tank through a "return pipe." The Lines device discloses pipes inside the storage tank which continue with insulators and electrical connections to the burner, from which the return pipe brings the excess oil back to the tank, the line constituting an electrical circuit.

Defendant between 1946 and 1948 sold 11 of plaintiff's systems and used and was familiar with plaintiff's literature. As to the issue of infringement, in 1948 defendant sold and supervised the installation in the plant of the Pesco Products Co. at Bedford, Ohio, of an oil burner for a boiler and other equipment, including an electric transformer. Defendant states in its brief that it understood this equipment would be used in the heating of heavy oil by the passing of a current through the pipes conveying the oil to the burner. At the same time defendant furnished the purchaser with certain drawings which suggested piping and wiring outlets and ways of mounting the suction and return pipes to the tank and providing an electrical circuit. Similar oil burning equipment has been furnished by defendant for three large buildings since the installation at Bedford.

The drawings and charts included in evidence show that the defendant's system, called the "accused system," in its salient features is identical with plaintiff's except for the fact that the small portions of the pipes within the storage tank are not heated by electric current in defendant's installation.

Defendant's Exhibit 4 A shows an electrical circuit with the supply and return pipes electrically heated from the oil tank to the burner. Defendant's Exhibit 20 shows defendant's tank unit with concentric pipes similar to plaintiff's and the pipe lines heated to a point immediately adjacent the exterior of the tank. While defendant does not heat the relatively short lengths within the tank, as plaintiff may under certain claims of the Lines patent not here involved, the pipe

not heated in defendant's tank unit is a small proportion of the length of the total piping. The accused system secures the effect of plaintiff's system in the manner taught in the Lines patent and, although showing a slight change in form, uses substantially the same devices, performing precisely the same offices with no change in principle. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S. Ct. 9, 74 L.Ed. 147.

■ Claim 4 is for a method and Claims 14 and 15 are for the apparatus. Neither of them expressly requires heating of the pipes within the tank. Defendant contends that if properly read Claims 4, 14 and 15 do not cover the accused system. It claims that the phrase in Claim 4 "electrically heating the pipe line during transit of the oil from the tank to the burner and return" requires "the electrical heating of the entire pipe line all during the movement of the oil." This construction is unsound. What the phrase means is that the pipe is electrically heated during transportation of the oil from the tank to the burner and return. Claim 4 says nothing about heating inside the tank. Defendant also claims that Claims 14 and 15, which do not have the phrase quoted, in light of the specifications and drawings require localized heating of the pipes in the tank. The specification states that it will usually be desirable to include the concentric pipes within the electric circuit "so that the supply liquid within these pipes will be heated in order to initiate the flow of liquid from the supply tank." Defendant urges that this statement demonstrates that the claims in issue require heating throughout the entire length of the pipe, both inside and outside the tank. This ignores the further statement in the specifications that "In some instances it may be desirable to heat certain sections only of the conductor pipes, rather than the entire conductor system. Such an arrangement is shown in Figure 4. . . " Figure 4 of the patent shows only certain sections of the pipe line as being heated. Thus the construction that we adopt for the phrase "during transit of the oil from the tank to the burner and return" is in accordance with the patent specifications and drawings. Moreover, a conclusive answer to defendant's contention is that the limitation that the current be passed through the pipes within the tank, which does not appear in the claims in issue, was expressly included in the remaining claims of the patent. To hold that this limitation existing in other claims and not existing in the claims in issue should be read into them would violate the established law. Whitaker v. Todd, 3 Cir., 232 F. 714; Baker-Cammack Hosiery Mills, Inc., v. Davis Co., 4 Cir., 181 F.2d 550, certiorari denied 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605.

■ We are in accord with the court's conclusions as to infringement. Having previously sold plaintiff's products and handled plaintiff's literature, defendant was fully aware of the advantages of plaintiff's system. In connection with the sale to Pesco Products Company, defendant represented in a purchase order that this system was the "Lines Thermal Electric System." "Thermal Electric" is plaintiff's trademark of its system. The District Court correctly found that the small modification made by defendant in not extending the pipes into the storage tank was adopted with a view of escaping infringement by pressing for a limited and restricted construction of plaintiff's claims. Defendant's system is the substantial equivalent of plaintiff's. The two systems do the same work in substantially the same way and accomplish the same result. Hence, they are the same, even though they differ in name, form or shape. Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Sanitary Refrigerator Co. v. Winters, supra; Farrington v. Haywood, 6 Cir., 35 F.2d 628; Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 608–609, 70 S.Ct. 854, 94 L.Ed. 1097.

As to the value of plaintiff's system the testimony is uncontradicted. Prior to its establishment the method of transporting heavy oil to a burner to be used as fuel was to heat the oil through "spot" heat-

ers employing steam or hot water. If the operation of the pump and oil burner were discontinued the oil ceased to circulate. In order to maintain flowability even though no heat was required it was necessary to continue the operation of the burner. This was expensive and sometimes involved supervision by an attendant. The old system of coil or hot water heating produced localized heat in the area served by the coil or immersion heater. The thermal electric system developed from use of the Lines patent applies heat uniformly throughout the piping system to the point where it is burned.

One witness who had purchased between 40 and 50 of plaintiff's installations now employs plaintiff's system in all jobs using residual oil, that is, heavy oil that needs heat for flowability. This witness, a building supervisor for a telephone company serving practically the entire state of Connecticut, said that the old conventional system at times produced a coking condition by reason of excess heat applied to the particular coil or immersion heater used. The biggest advantage in plaintiff's thermal system, he said, is that the heat is applied uniformly throughout the piping system to the point where it is burned. With the old conventional system he would have to employ some outside source to warm the oil after it had become congealed, and this was true whenever there was a shutdown for any substantial period of time. In one case, this witness stated, oil which had been standing in the tanks for three or four years was set in circulation within a half hour in the winter months by the use of plaintiff's system. Three other disinterested witnesses who had used or sold the Lines system testified that it had greatly reduced costs of installation and operation. Defendant introduced no testimony to contradict the evidence of economy and efficiency resulting from the use of plaintiff's system, but it vigorously contends the Lines patent discloses no patentable feature.

Upon this point also we agree with the District Court. The Lines patent discloses a new combination of known elements, producing a new method of operation and a new and beneficial result. Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177.

The principal patents relied upon as constituting anticipation were before the Patent Office and thoroughly considered. (Carter, No. 1,880,794, Davis, No. 1,733,-250, Swoboda, No. 1,994,838, Batchelder, No. 1,019,413, and Berres, No. 1,332,970). Of these Carter and Swoboda, which were the disclosures closest to Lines, in addition to the electric current employed for heating the pipes had to use separate means of heating material within the supply tank. Lines provides a single circuit which promotes the flow of liquid through the pipes by keeping it at all times in a heated condition. With one system and one electrical circuit he secures everything that Carter, Swoboda and Davis suggest by two separate and independent heating means. Carter employs gas burners to melt the lead which is to be coated on telephone equipment. Swoboda uses a separate heating coil.

Carter is the closest reference before the Patent Office. This patent discloses an extremely intricate apparatus for melting lead and supplying it in molten form to extruding presses. It employs a number of kettles, each provided with a gas burner to heat the metal, and calls for electrical heating of the pipes to transport the molten lead. For the purposes of this case what Carter shows is that it was old to heat pipes electrically and to transport molten metal through them.

Since Carter, Swoboda, Davis, Berres, and Batchelder were before the Patent Office and, as shown by the file wrapper, were thoroughly considered, the presumption of validity which arises from the allowance of the patent is greatly strengthened. Williams Manufacturing Co. v. United Shoe Machinery Corp., 6 Cir., 121 F.2d 273, 277, affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537.

The patents and publications cited for the first time in the District Court add

but little to the consideration of the problem. As conceded by plaintiff, the prior art discloses that electrical heating of liquids and materials to secure fluidity was old and that transportation of such liquid and molten material in pipes electrically heated was old. We deem it unnecessary to discuss in detail the prior art patents and publications listed in defendant's pleadings with the exception of Mills patent No. 1,461,541 and Haslam, a publication on "Fuels and Their Combustion," which are heavily relied on. In fact, defendant says these two citations disclose everything shown by Lines except electrical heating.

In order to resolve this question we consider what Lines really discloses. In addition to the electric current applied to the pipe and the transportation in heated pipes, a new feature described in the Lines specifications not claimed in any cited patent and expressly stated in every claim in issue here is that the excess liquid in the burner is returned to the tank at a point adjacent to the inlet of the supply pipe, so that this heated liquid is again drawn into the inlet of the supply pipe, as Claims 4, 14 and 15 specify, without being diffused through the colder liquid in the tank. This feature is important because it eliminates the necessity of a heater in the tank. Defendant says that this feature existed in the prior art. As to Carter, upon which it relies strongly, defendant concedes that whether the return pipe is adjacent to the supply pipe as shown in Lines is a "relative matter" depending on dimensions, but no dimensions are given.

Another feature of Lines not shown in the prior art is that he heats the fuel at the outer surface of the column of oil which is against the pipe, namely, at the point of friction. This feature is disclosed in the Lines specifications and is described in the evidence. It does not exist in any cited patent or publication. One witness stated that this surface heating caused the column of oil to flow through the pipe like the action of butter on a hot knife. Obviously, when only the surface is heated, in distinction to the center or "core" of the stream of oil, fluidity is secured with a relatively small amount of current.

Haslam employs a steam coil in the tank and requires a supply of steam. Under the Lines patent the heating coil in the tank is eliminated and the excess oil is not mingled with heated oil. Not only does this feature result in added economy and efficiency but it supports the conclusion of the District Court that the prior art does not disclose the method nor the apparatus combination of Lines.

The purpose of the Mills patent is to heat congealed liquids in order "to render them liquid or mobile and to maintain them in that condition," and thus to solve the difficulties presented by the removal and transfer of such congealed liquids as, for instance, in the unloading of tank cars. Mills presents a complicated mechanism. No electric heating of pipes is disclosed. No testimony is given as to dimensions or operation. As shown by the claims and specifications, oil heated by steam is piped to a "deep or small tank" and later transferred "preferably as a shifting jet" through a rotating nozzle into the congealed or jellied substance in the storage tank for the purpose of dissolving the substance. The operation of Mills thus is the opposite of that described in Lines, for the heated oil is diffused through the substance in the tank, the velocity of the jet being increased and the nozzle being directed to distant points within the tank so as to secure liquefaction. The method and apparatus of Mills do not disclose the novel elements of Lines described above.

The complex features of the prior art in this field as compared with the compact and simple mechanism of Lines are thrown into highlight by the number of valves employed in the patents asserted to be close to Lines, namely, Carter and Mills. Mills employs 10 valves, Carter employs over 20 valves. Carter recognizes in his specifications the multiplicity of valves and suggests that multi-way valves be employed.

None of the prior art devices nor publications disclose a method of transport-

ing oil in which the oil is pumped in excess to the burner and returned to cold storage at a point adjacent to the suction line, the use of the expensive heating coil being eliminated, both supply and return pipes being heated electrically, so that the oil which is returned to the storage tank is drawn into the suction line without being diffused through the cold oil within the tank. So far as this record discloses, the statement made by one highly experienced witness that there is no fuel handling system on the market at present which will duplicate the work performed by the Lines system is correct.

It is vigorously contended that plaintiff by its argument before the Patent Office "induced" the examiner, through misrepresentations of the scope of the claimed invention, to allow claims which had previously been denied. While fraud is not expressly charged, the words "induce" and "inducement" carry an implication of improper conduct. It suffices to say that the contentions advanced by plaintiff's counsel in the argument for amendment of the original claims of the Lines patent which, after extended consideration by the Patent Office, resulted in the allowance of the claims in suit, are in general sustained by the specifications, claims and drawings of the various patents cited before the Patent Examiner and were not improper.

Defendant filed a counterclaim in which it charged that plaintiff, through its engineering service in which it supplies unpatented devices, such as tank units, burners, pipe joints, and transformers built to its specifications and installed by it, has established a monopoly in violation of the anti-trust law. Plaintiff, it says, requires users of its oil supply systems to purchase unpatented items from plaintiff and to pay tribute through its service arrangement. Since the devices are built to plaintiff's specifications we think this contention has no merit. No legal authority is cited in support of the proposition. The District Court found, we think correctly, that there is no evidence that plaintiff by its course of business attempted or intended to obtain a monopoly in the sale and installation of the unpatented parts of its combination system. As pointed out by the court, the pieces of the system are not sold at a price per piece, but the system is quoted as a complete unit and installation. If the purchaser wishes to have plaintiff install its system and has no choice with respect to the type of transformer or piece of equipment, the fact that plaintiff specifically adapts non-patented parts and sells them in the installation in no sense constitutes a monopoly.

The injunction issued by the District Court was not improper. Cf. Cugley v. Bundy Incubator Co., 6 Cir., 93 F.2d 932, 935.

The judgment of the District Court is affirmed.