**MUELLER et al. v. CAMPBELL et al.**

**No. 279.**

District Court, S. D. Ohio, W. D.

June 23, 1945.

See also 68 F.Supp. 475.

F. O. Richey and H. F. McNenny, of Richey & Watts, all of Cleveland, Ohio, and Jos. D. Chamberlain, of Dayton, Ohio, for plaintiff.

John J. Mahoney, of Corbett, Mahoney & Miller, all of Columbus, Ohio, for defendants.

NEVIN, District Judge.

This is a patent suit wherein plaintiffs charge defendants with infringement of Hunt Patent No. 2,300,157.

Plaintiffs are George R. Hunt, of Akron, Ohio, the patentee, and Conrad B. Mueller, of Cleveland, Ohio, the exclusive licensee of the plaintiff Hunt, under the patent-in-suit. Plaintiff, Conrad B. Mueller, does business under the names of Mueller Metal Products Company and Greenbrier Company of Cleveland, Ohio.

The defendants are Harold C. Campbell, of Ashley, Ohio, manufacturer of defendants' alleged infringing device; H. D. Thomas, doing business as The Thomas Company of Delaware, Ohio, who purchases machines from the defendant Campbell, and sells them to the trade, and William E. Ginovan, doing business as Ginovan Poultry Market, at Xenia, Ohio, a user of the alleged infringing (Campbell) machine.

The ownership of the patent is not in dispute. It is conceded that the patentee, George R. Hunt, is the owner of the legal title to the patent and that the plaintiff, Mueller, is the exclusive licensee of Hunt and the owner of the equitable title thereto.

Plaintiffs filed their complaint on October 7, 1943. On November 18, 1943, defendants filed their answer, and with their answer included a counter-claim. As a part of the counter-claim they allege that the defendants, Harold C. Campbell and H. D. Thomas, have an implied license under the patent-in-suit. In their counter-claim, defendants further charge plaintiffs with unfair competition on account of which they pray for damages and an accounting.

On May 31, 1944, certain amendments were filed by defendants to their original answer. In their answer and the amendments thereto, defendants deny infringement and allege invalidity of the patent upon the several grounds set forth.

On December 6, 1943, plaintiffs filed their reply to the counter-claim denying the allegations thereof.

During the progress of the trial (R. p. 29), defendants asserted that they were also relying upon the claim or defense of "unclean hands" upon the part of plaintiffs. This defense is not raised in the pleadings.

At the conclusion of the trial (R. pp. 1361 et seq.) the Court decided and disposed of the issues of unclean hands, implied license and the other issues raised by the counter-claim and the reply thereto.*

It would serve no useful purpose, therefore, to discuss these questions further at this time. Such reference to them as is necessary is made in the Court's Findings and Conclusions. The issues remaining to be now determined are those of (1) validity of the Patent and (2) infringement.

## VALIDITY.

Involved in the question of the validity of the patents are the defenses asserted by defendants of (a) anticipation; (b) exercise of invention as distinguished from mechanical skill; (c) whether or not Claims 16, 17 and 19 are indefinite and ambiguous, and (d) whether or not claims 12, 14, and 16 are based upon new matter in the patent-in-suit.

The patent-in-suit was issued on October 27, 1942. It is for "Feather-picking apparatus for fowls and the like." It contains 19 claims. Of these, claims 2, 3, 7, 10, 12, 14, 16, 17 and 19 only are here in issue. These claims may be further classified as follows: Claims 2, 3, 7, 10 and 17 are machine claims; Claims 12, 14 and 19 are Finger Claims; and Claim 16 is a Method claim.

The device of the patent-in-suit consists of an apparatus used in the poultry business for picking feathers from fowls in the course of preparing poultry for the market. Its purpose, broadly, is to eliminate hand picking of feathers from poultry.

Basically, the machine consists of a drum mounted in a frame and revolved by an electric motor, having flexible fingers arranged completely around the drum and extending outwardly from the periphery thereof. A chicken (or other fowl) which has previously been scalded, is pressed against the revolving drum and the fingers remove the feathers by a rubbing or scraping action. The operator manipulates the bird by turning it and twisting it so that all parts of the body contact the fingers of the revolving drum.

### (A) Anticipation.

(As to the Machine and Finger Claims.)

At the trial defendants selected claim 2 as typical of the Machine claims in issue. Plaintiffs, however, prefer to use claims 2 and 3 as representative. These claims read as follows: "2, a feather plucking device comprising a rotable member having secured thereto means projecting from the outer surface thereof, said means being substantially cylindrical in shape, of elastic material, and having projections on the surface thereof, a portion of said means adjacent one end thereof being hollow. 3, a feather plucking device comprising a rotable member having secured thereto means projecting from the outer surface thereof, said means being substantially cylindrical in shape, of elastic material, and having projections on the surface thereof, a portion of said means having a thin wall and the remainder thereof having thicker wall portions."

Claim 12—selected by defendants as representative (Br. pp. 32 et seq.) of the Finger Claims in issue—reads as follows: "12, a poultry plucking finger member of the character described comprising a substantially cylindrical body formed of elastic material and having projections on the outer surface thereof, a portion of said body throughout its length being hollow, the walls of the body being sufficiently thick to avoid collapse in a direction parallel to the longitudinal axis when the finger is in use."

Defendants assert that all of the elements of the Machine (2, 3, 7, 10 and 17) and Finger (12, 14 and 19) Claims in issue of the patent-in-suit, are old; that they "Are invalid because all specific elements thereof are shown in the prior art patents" and

---

* The decision of the Court on these issues is printed herein as Appendix A.

in support of their assertions, defendants offered in evidence, a book containing the patents referred to in their answer and the amendments thereto, now Exhibit "S" herein.

Among the patents so offered are those to Morava, No. 793,210; Morrison No. 837,330; Griggs No. 920,566; Bouda No. 1,372,595; Young No. 1,502,535; Richards No. 1,755,665; Swanson No. 1,889,228, and Jahns, (German) No. 450,570, and No. 450,571.

In their brief defendants submit that the foregoing patents, either alone or in combination with other patents, disclose all of the elements of the Hunt patent-in-suit, and that either separately or in such combination, are a complete anticipation of the claims of the Hunt patent. For example, referring to Morava, Patent No. 793,210, defendants say (Br. pp. 21, 22), "although this Morava device was designed for picking cotton it would be adaptable for plucking feathers from fowls. The picking of cotton is a delicate operation and from the use and demonstration of the prior art machines to Morrison and Jahns, defendants' Exs. W and V, it will be evident that the Morava device could be used to pick feathers from chickens as the device has every element of the Hunt patent. * * * · The patent to Morava, therefore, shows every element of the Hunt machine claims and therefore anticipates these claims of the Hunt patent. * * * Morava shows a finger having all the characteristics or structures defined in the Hunt finger claims * * * Morava would therefore constitute a complete anticipation of these claims."

At the trial, the witness Corey (defendant's expert) testified that Swanson patent No. 1,889,228 was the best reference to all of the claims of the patent-in-suit, except claims 12 and 16, and that Griggs, Patent No. 920,566 was the best reference to claim 12.

As to the Swanson patent No. 1,889,228, defendants submit (Br. pp. 18 and 24) that it contains every element of both the Machine and Finger claims of the patent-in-suit and that it "Therefore constitutes a complete anticipation of these claims."

As to Griggs, No. 920,566, defendants assert (Br. p. 23) that "this Griggs patent shows fingers having all the elements defined in the Finger claims of the Hunt patent and therefore, constitutes a complete anticipation of Hunt's Claims."

While reference to prior art patents relied upon for anticipation by defendants is included by the Court, in its Findings and Conclusions, nevertheless, it may be noted here in passing, that Swanson depends entirely upon suction to remove the feathers and that the rotation of the fowl by the rotating suction devices would prevent any mechanical action such as Hunt uses to remove the feathers. Furthermore, Swanson states that one of the objects of his invention is "to provide a mechanical picking means for the fowls after they come from the scalding machine, which effectively removes most of the feathers therefrom, so that the fowl can be subsequently dried and then dipped in a substance reduced to fluid by heat, such as paraffin, whereby to coat the fowl so that after it is removed from the substance the atmosphere will harden the coating, whereupon the fowl can easily be 'peeled' by hand of the paraffin coating, which brings with it all remaining feathers, pin feathers and hair."

Hunt, on the other hand, has as an object of his invention, "A feather picking apparatus * * * which will remove all of the feathers, including pin feathers, hair, etc., from a fowl in a minimum of time, with but little effort on the part of the operator."

Morrison, in his patent No. 837,330, proposes to withdraw the feathers from the fowl gradually by the use of clamping-jaws "co-operating to grasp the feathers and frictionally hold the same while being loosened from the skin of the bird, after which the feathers may be withdrawn by pneumatic or other means and conveyed to any suitable location." The scheme of Morrison is not practicable for a commercial device—it would be even slower than hand picking.

The Jahns (German) patents Nos. 450,570 and 450,571 are respectively for a machine and roller "for the removal of scales from fish." As plaintiffs point out

(Br. p. 55) the only fair interpretation of the Jahns patent (No. 450,570) is that Jahns contemplated using in this patent only the type of teeth or brush shown in the second Jahns patent (No. 450,571).

The device and fingers of the Griggs patent No. 920,566 differ in structure, mode of operation and results from the Hunt patent. The "pickers" (fingers) "are controlled in part by pneumatic means." The rubber finger (or picker) of Griggs was to be expanded and contracted longitudinally with the view that feathers might be gripped in the corrugations of the contracted fingers and released when the finger was expanded as shown in figure 6. Even if a few feathers could be gripped in the folds of the finger and withdrawn, the device would be too slow for commercial use, nor was it ever so used.

(B) Exercise of Invention as Distinguished from Mechanical Skill.

Mr. Corey, defendant's expert, testified (R. pp. 756, 757, see also Exhibit 50), that the unsolved problem of "poultry picking" was the invention and production of "a machine suitable for picking poultry rapidly and effectively without injury to the tissue of the fowl, and in such manner that quantity production may be attained."

As plaintiffs state in their brief (p. 46) the difficulty of a part of the problem (that is mechanically picking poultry without injury to the skin or flesh of the fowl) was enhanced by the variety of feathers which are grown upon chickens (Exhibits 51 and 54) and the various recesses and reentrant parts over the fowl which must be reached. Broadly speaking, there are five different kinds of feathers upon a chicken—the flight feathers, the cover feathers, the down feathers, the hair feathers, and the pin feathers. Sometimes the pin feathers do not extend above the surface of the skin. It was necessary that the machine should remove substantially all of these feathers, no matter where they are located upon the fowl. They must be taken out from under the wings and from under the thighs.

The evidence in the instant case shows that there are about 8,000 feathers on a chicken and that the Hunt machine re-moves all types of feathers from all positions of the fowl, doing so at the rate of approximately (1,000) feathers a second or perhaps even faster.

There is no proof that any of the machines referred to in the prior art can or will pick poultry so rapidly and effectively without injury to the tissue of the fowl, and in such a manner that quantity production can be attained, nor is there any proof that a single machine of the prior art was ever used commercially.

In a very recent decision (May 21, 1945), the Supreme Court in the case of Sinclair & Carroll Co. Inc., v. Inter-chemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 say: "A long line of cases has held it to be an essential requirement for the validity of a patent that the subject-matter display 'invention', 'more ingenuity * * * than the work of a mechanic skilled in the art,' Hicks v. Kelscy, 18 Wall. 670, 21 L.Ed. 852; Slawson v. Grand Street P. P. & F. R. Co., 107 U.S. 649, 2 S.Ct. 663, 27 L.Ed. 576; Phillips v. City of Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; Morris v. McMillin, 112 U.S. 244, 5 S.Ct. 218, 28 L.Ed. 702; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Honolulu Oil Corp. v. Halliburton, 306 U.S. 550, 59 S.Ct. 662, 83 L.Ed. 980; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 40, 86 L.Ed. 58. This test is often difficult to apply; but its purpose is clear. Under this test, some substantial innovation is necessary, an innovation for which society is truly indebted to the efforts of the patentee."

The Court is of the opinion that the patent-in-suit (Except claim 16 thereof, to be hereinafter referred to) falls within the foregoing pronouncement; that the subject matter does display "Invention," "more ingenuity * * * than the work of a mechanic skilled in the art." While the Court entertains no doubt as to "Invention" its view in this respect is strengthened by the fact that prior to Hunt there had long existed a want and need for such a device, which prior patents had failed to supply, by the commercial success of the Hunt machine and its reception by the public.

In Reeke-Nash Motors Co. v. Swan Carburetor Co., 88 F.2d 876, 885, 886, the Court of Appeals of this (6th) Circuit, state: "If we were to consider the question of invention a close one, the wide commercial success of the device and its adoption after thorough tests by experts strengthens the presumption of validity. Motor Improvements, Inc. v. General Motors Corp. 6 Cir., 49 F.2d 543."

(C) Whether or Not Claims 16, 17 and 19 are Indefinite and Ambiguous.

Upon a consideration and study of these claims the Court is of the opinion that they are neither indefinite nor ambiguous.

(D) Whether or Not Claims 12, 14 and 16 are Based upon New Matter in the Patent-in-suit.

Upon the question here presented, the views of the Court are sufficiently expressed in its Finding No. 24.

■ It is now axiomatic that a patent regularly issued is presumed to be valid. As stated by the Court in Merco Nordstrom Valve Co. v. W. M. Acker Organization, 6 Cir., 131 F.2d 277, 280, "Of course the patent itself was prima facie evidence of its validity," and that presumption is strengthened where, as here, the patent issued after a hearing of rival claimants. Radio Corp. v. Radio Engineering Laboratories, 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163.

■ The burden of proving want of novelty is upon him, who avers it. Not only is the burden to make good this defense upon the party setting it up, but his burden is a heavy one, as it has been held that " 'every reasonable doubt should be resolved against him.' * * * Cantrell v. Wallick, supra [117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017]; Coffin v. Ogden, 18 Wall. 120, 124, 21 L.Ed. 821; Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All-Barb-Wire Co.) 143 U.S. 275, 284, 285, 12 S.Ct. 443, 450, 36 L.Ed. 154, 161; Adamson v. Gilliland, 242 U.S. 350, 353, 37 S.Ct. 169, 61 L.Ed. 356." Mumm v. Jacob E. Decker and Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983.

■ One otherwise an infringer who assails the validity of a patent, fair upon its face, bears a heavy burden of persuasion and fails unless his evidence has more than a dubious preponderance. Williams Mfg. Co. v. United Shoe Machine Corp., 6 Cir., 121 F.2d 273, affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537.

■■ In view of all the foregoing the Court is of the opinion and so finds that Claims 2, 3, 7, 10, 12, 14, 17 and 19 here in issue of the Hunt patent-in-suit No. 2,300,-157 are each and all valid.

As to Claim 16 (the Method Claim).

Claim 16 of the Hunt patent-in-suit reads as follows: "A Method of plucking feathers from fowls comprising holding a fowl in position while continuously applying directly to only one side of the body thereof repeated applications of force in an arcuate direction and also to the feathered portion thereof while substantially simultaneously striking and rubbing said side and said feathered portion, the initial striking force taking place radially a distance outwardly from the application of the rubbing force and in substantially the same plane as the rubbing force, the opposite side of the fowl being freely exposed so as to facilitate ready handling by the operator, said rubbing forces being the main forces utilized in the removal of feathers."

Claim 16 does nothing more than define the action which occurs when a flexible member carried by a wheel strikes or rubs an article being polished or processed. This method had been used in long years by artisans and mechanics in connection with the use of a rotating member, drum or wheel in buffing, grinding and polishing and otherwise cleaning various bodies or objects. The rule seems well settled that it is not invention to use an old process for a new and analogous purpose. Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307; Miller v. Foree, 116 U.S. 22, 6 S.Ct. 204, 29 L.Ed. 552; Thomson Spot Welder Co. v. Ford Motor Co., 6 Cir., 281 F. 680, affirmed 265 U.S. 445, 44 S.Ct. 533, 68 L.Ed. 1098.

The Court is of the opinion and so finds that Claim 16, of Hunt patent-in-suit No. 2,300,157 (the Method Claim) is invalid.

## Infringement.

The evidence in the instant case convincingly and conclusively shows that the machine and the fingers (as well as the Method) of the Hunt patent and the defendants' machine and fingers are identical in the offices they perform and in the manner in which they perform them, the oral testimony showing identity was supported by the demonstrations made in the presence of the Court. There is further support in defendants' advertisements constituting a part of Exhibit 14, and marked 14-A to 14-L, inclusive. Such variations as there are between the two devices are wholly immaterial. At best they are merely colorable.

In E. H. Bardes Range & Foundry Co. v. American Engineering Co., 6 Cir., 109 F.2d 696, at page 698, the Court say: "A close copy which seeks to use the substance of the invention, and although showing some change in form and position, uses substantially the same device, performing precisely the same offices with no change in principle, constitutes an infringement. Ives v. Hamilton, 92 U.S. 426, 430, 23 L.Ed. 494. Even where the invention must be restricted in view of the prior art to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, there is infringement where the departure is merely colorable. Duff v. Sterling Pump Co., 107 U.S. 636, 639, 2 S.Ct. 487, 27 L.Ed. 517; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 50 S.Ct. 9, 74 L.Ed. 147."

The Court is of the opinion and so finds that the accused device of defendants infringes Claims 2, 3, 7, 10, 12, 14, 17 and 19 of Hunt patent-in-suit No. 2,300,157.

## Costs.

Beginning at page 1379, the record shows the following:

"The Court: Under the rulings just made, the defenses of unclean hands and implied license are no longer in the case. Neither is defendants' counter-claim, and those matters need not be argued or presented further by counsel in their briefs. * *

"Mr. Richey (of counsel for Plaintiffs): Does your Honor wish to rule on the questions of costs on those defenses at this time?

"The Court: No, I haven't given that any consideration; * * * I would prefer, if you wish to raise that question, that you do so in your brief and let Mr. Mahoney reply to it, * * * I am not prepared to pass on it at this time. * * *"

No specific reference to the "costs" above referred to is made in any of the briefs of counsel.

Plaintiffs, in their brief (p. 65), submit that they are entitled to the relief prayed for, including " * * * costs on all phases of the case." Defendants say (Br. p. 77) that "the complaint should be dismissed at plaintiffs' costs." There are no further statements on the subject.

As the question of costs is disposed of by the Court in its "Conclusions" further discussion here is unnecessary.

Upon a consideration of the whole of the record, the briefs and arguments of counsel and the applicable law, the Court has arrived at the following:

## Findings of Fact.

1. This is a suit under the Patent Laws of the United States charging defendants with infringement of United States Patent No. 2,300,157, issued to George R. Hunt on October 27, 1942, pursuant to an application filed November 16, 1939. The patent is for a "Feather-picking apparatus for fowls and the like."

2. Plaintiff, George R. Hunt, is the owner of the legal title of the patent-in-suit, and plaintiff, Conrad B. Mueller is the owner of the equitable title thereof by virtue of an exclusive license agreement dated February 14, 1940.

3. Defendant, Harold C. Campbell, residing at Ashley, Ohio, has been doing business at Delaware, Ohio, since October 27, 1942, manufacturing and selling the accused poultry picking machines, illustrated in Campbell patent No. 2,302,525. Defendant, H. D. Thomas, since October 27, 1942, has been doing business as The Thomas Company at Delaware, Ohio, selling the accused machine manufactured by defendant,

Harold C. Campbell. Defendant, William E. Ginovan, is doing business as Ginovan Poultry Market, at Xenia, Ohio, and since September, 1943, has been using one of the accused machines manufactured by defendant, Harold C. Campbell.

4. The patent-in-suit contains 19 Claims. Of these only Claims 2, 3, 7, 10, 12, 14, 16, 17 and 19 are here in issue. These claims are divided as follows: Claims 2, 3, 7, 10, and 17 are Machine Claims; Claims 12, 14 and 19 are Finger Claims, and Claim 16 is a Method 'Claim.

5. The device shown and described in the Hunt patent-in-suit consists of an apparatus used in the poultry business for picking feathers from fowl in the course of preparing poultry for the market. The machine comprises a structure consisting of a drum mounted in a frame, and revolved by an electric motor, having flexible fingers arranged completely around the drum and extending outwardly from the periphery thereof. In operating the device, a chicken (or other fowl) which has previously been scalded is pressed against the revolving drum, and the fingers remove the feathers by a rubbing or scrubbing action. The operator manipulates the chicken by turning it and twisting it so that all parts of the body contact the fingers of the revolving drum.

6. The problem which existed in the art prior to the invention covered by the Hunt patent-in-suit was in general to pluck poultry (fowl) mechanically and specifically to remove feathers from poultry rapidly and effectively without injury to the poultry and in such a manner that quantity production could be obtained. This problem in particular had existed and had been recognized in the art at least since 1916 within the knowledge of the witnesses testifying in this case and to general knowledge always. At least since 1916 throughout the poultry industry there had been a need and a demand for a machine for plucking poultry, which would increase production and decrease the labor required, without injuring the poultry. Always there had been a demand and a need for a machine which would pluck poultry.

7. From time immemorial poultry has been plucked by hand. Hand plucking had many disadvantages which had long been recognized in the art. Hand plucking was slow and laborious, very unsanitary, expensive, and involved considerable loss from scuffing, barking, or breaking the skin of the poultry.

8. Leading manufacturers of poultry equipment, since at least 1916, had been trying to develop a machine for plucking poultry which would successfully remove the feathers without injuring the poultry. Too, they had been searching for any such machine that might have been produced by others. Both these trials and these searchers were unsuccessful until the appearance of the machine of the Hunt patent-in-suit. In the course of these efforts the devices shown in the patents to Swanson, No. 1,-889,228, Richards No. 1,755,665 and Bouda, No. 1,372,595, were tried out. They failed to accomplish the desired result. Many ideas were suggested, most of which were found to be impracticable and useless.

9. Plaintiff, George R. Hunt began experiments in the basement of his home in 1931 in an effort to produce a poultry plucking machine. All of his efforts failed until in 1937, he produced a machine which he tried out experimentally at the home of a friend, Edwin Ilg. While this machine successfully removed feathers without injuring the poultry it was too slow to be of commercial use nor would it remove all of the feathers from a chicken. Hunt continued his experiments finally, in 1939, producing a machine substantially as shown in the drawings of the patent-in-suit.

10. Hunt solved the problem of rapidly and effectively removing the feathers from poultry by machine so that quantity production could be obtained, but without injury to the poultry.

11. The device of the Hunt patent-in-suit is effective to pick poultry efficiently and rapidly without injury to the poultry with any of the three different kinds of scalds used commercially. With the "slack" scald which is used commerically in picking chickens (poultry) for immediate sale and consumption the device of the patent-in-suit removes substantially all of the feathers in not more than about ten seconds per chicken. Using the "semi-scald," which

is used commercially in the picking of chickens which are to be placed in cold storage, the machine removes about 85% to 95% of the feathers without injuring the epidermis or delicate outer layer of the skin.

12. The art selected by the defendants' expert as the best art to the machine and finger claims (Swanson Patent No. 1,889,-228 and Griggs Patent No. 920,566 respectively), was before, and given consideration by the Patent Office Examiners both in ex parte and inter partes considerations of the claims of the patent-in suit.

13. With but immaterial exceptions, all of the prior art relied upon in this Court was before the Patent Office and considered by the Examiners both in ex parte and inter partes proceedings. It was urged against the claims in suit by the defendants' expert (in the instant trial) during the proceedings in the Patent Office on the Hunt application.

14. The German patent to Jahns No. 450,570 does not disclose the material of the "brushes or teeth" projecting from the "brush roller." The only function disclosed in the Jahns patent is the removal of scales from fish. Any material for the brushes or teeth in the machine disclosed in the Jahns patent which would be capable of removing scales from fish would be incapable of removing feathers from poultry without injury to the poultry. This patent does not anticipate, or negative the novelty of, any of the claims in suit.

15. The device, Defendants' Exhibit V differs from the device disclosed in the Jahns patent No. 450,570 in structure, mode of operation and results. It has no probative value here.

16. Morrison patent No. 837,330 does not disclose the nature of the connection between the flaps I' and the brush I. The only function disclosed in the patent for the brush I is to wipe down from the skin of a bird after the feathers have been plucked. The "clamping-jaws" mechanism constituting the remainder of the machine disclosed in the Morrison patent is said by the patent to be for the purpose of plucking the feathers from the bird. This patent does not anticipate, or negative the novelty of, any of the claims in suit.

17. The device, Defendants' Exhibit W asserted to represent the machine of Morrison Patent No. 837,330, differs therefrom in structure, mode of operation and results. It has no probative value here.

18. There is no anticipation of the claims 2, 3, 7, 10, 12, 14, 17 and 19 of the Hunt patent-in-suit.

19. The machine of the Hunt patent-in-suit met with immediate success. Plaintiff, C. B. Mueller learned of the Hunt machine through a purchase of some chickens which had been plucked on a Hunt machine. Mueller thereafter obtained an exclusive license on the Hunt invention and in September 1939 started to manufacture machines on a commercial scale. The Barker Poultry Equipment Company of Ottumwa, Iowa, hearing of the machine, sent a representative to Akron, Ohio, to investigate. After further tests, including renewed unsuccessful efforts with the devices of Swanson patent No. 1,889,228 and Richards patent No. 1,755,665, The Barker Company obtained a sub-license from plaintiffs.

20. Plaintiff, C. B. Mueller, The Barker Poultry Equipment Company, and The Ashley Machine Company of Piqua, Ohio, have been manufacturing and selling machines licensed under the Hunt patent-in-suit. These machines were sold in increasing qualities until 1942, when production was restricted by the scarcity of material and labor caused by the war.

21. The commercial success of the device of the Hunt patent-in-suit has not resulted from advertising but rather from actual demonstrations of machines embodying the invention and the merit and achievement of machines in use.

22. The machine defined by each of the claims 2, 3, 7, 10 and 17 and the finger defined by each of claims 12, 14 and 19 of the Hunt patent-in-suit is new and useful, accomplishes important new results and embodies patentable invention.

23. None of the Hunt claims in suit is indefinite or ambiguous.

24. The matter inserted by amendment in the application for the Hunt patent-in-suit and appearing in lines 49-53 col. 1,

page 2 of the patent, is a statement of a characteristic or property of the fingers disclosed in the original specification and additionally disclosed in the original drawings. It was covered by the original oath; is not a broadening of the invention originally disclosed and claimed and is not new matter.

25. The operation by plaintiff George R. Hunt, of the device illustrated by Defendants' Exhibits C-1, C-2 and C-3 at the home of Edwin Ilg at Talmadge, Ohio, in September, 1937, was an experimental test of that device; was conducted entirely under the control of Hunt; was continued no longer than necessary to test the device; was performed solely for the purpose of testing the device and not for profit or pay of any kind; was followed by scrapping of the particular device and the building of new machines differing therefrom in structure to incorporate the things learned by Hunt during the test; was accompanied by no intention by Hunt to abandon his invention; and was not a public use of either the machine invention or the finger invention covered by the Hunt patent-in-suit.

26. Each of claims 2, 3, 7, 10, 12, 14, 17 and 19 of the patent-in-suit is valid.

27. Claim 16 of the Hunt patent-in-suit (the Method Claim) is invalid. It does nothing more than define the action which occurs when a flexible member carried by a wheel strikes or rubs an article being processed. This method has been used for long years by artisans and mechanics in connection with a rotating member, drum or wheel in buffing, grinding, polishing and otherwise cleaning various bodies or objects.

28. The machines manufactured by defendant Campbell, sold by defendant Thomas, and used by defendant Ginovan, which machines are illustrated in Campbell patent No. 2,302,525 (Plaintiffs' Exhibit 16) operate in the same way and obtain the same results as the machine disclosed in the Hunt patent-in-suit, and are substantially identical therewith in structure. The fingers of the defendants' machine exemplified by Plaintiffs' Exhibit 28, are substantially identical in structure and identical in operations and results with the fingers

disclosed in the Hunt patent-in-suit. The differences in the number and size of the corrugations and the differences in the manner in which the increased flexibility and decreased weight are obtained at the outer ends of the fingers between defendants' fingers, Plaintiffs' Exhibit 28, and the fingers disclosed in the Hunt patent-in-suit, do not effect the functioning or the results of the two fingers. Such variations as there are between the machine and fingers of defendants' device and those of the Hunt patent are wholly immaterial and at best are merely colorable.

29. The license agreements under the Hunt patent-in-suit, Plaintiffs' Exhibits 9, 10, 10-a, 11-21, 21-a, and 61, do not contain any conditions acting to enlarge the patent monopoly or to give the patentee Hunt or the licensee Mueller any additional monopoly or additional right which the statute and the patent together do not give. None of said license agreements, Plaintiffs' Exhibits 9, 10, 10-a, 11, 21, 21-a and 61, contains any provision enlarging or abusing, or tending to enlarge or abuse the rights granted by the patent itself or any provision restraining trade or tending to restrain trade.

30. Defendant, Harold C. Campbell, prior to the fall of 1939 was in the business of selling poultry and eggs, and in the fall of 1939, while delivering live poultry in Marion, Ohio, saw one of the machines of the Hunt patent-in-suit. Immediately thereafter Campbell started to build a poultry picking machine which he completed in early 1940. Thereafter in association with others Campbell formed The Ashley Machine Company, a corporation of Ohio, filed an application for patent which issued as Campbell patent No. 2,302,525, Plaintiffs' Exhibit 16, and began manufacturing and selling the machines illustrated in said patent, Plaintiffs' Exhibit 16.

31. The application for the Campbell patent was filed June 27, 1940. At that time the application for the Hunt patent-in-suit which had been filed November 16, 1939, was pending in the Patent Office. Thereafter, interferences were declared by the United States Patent Office involving, inter alia, the application for the Campbell patent, Exhibit 16, and the application

for the Hunt patent-in-suit, Exhibit 15, including Interference No. 78,953, the issue of which included claims 2, 3, 12 and 14 of the Hunt patent-in-suit, and Interference No. 78,955, the issue of which included Claims 7, 10 and 16 of the Hunt patent-in-suit.

32. In accordance with the practice in the Patent Office Campbell filed preliminary statements in these interferences including Defendants' Exhibit Q-2, Paper No. 5. These preliminary statements were statements under oath as to the dates upon which Campbell made the inventions defined by the counts in issue in the interferences. At the trial of this case Campbell testified that the dates given in the preliminary statements were false and were known by him to be false at the time he executed the affidavits. Campbell's associates and attorneys did not know that the dates in the preliminary statements were false. Campbell's purpose in giving the false dates in the preliminary statement was to antedate the Hunt machine which he had seen at Marion, Ohio, and to attempt to obtain in his patent the Hunt inventions embodied in that machine.

33. On July 7, 1941, Campbell sold to his associates his interest in The Ashley Machine Company. Shortly thereafter Campbell wrote to Mr. Barker, President of Barker Poultry Equipment Company of Ottumwa, Iowa, a license[e] under the Hunt patent-in-suit, telling him that he was not with The Ashley Machine Company any more and suggesting a meeting to discuss the patent situation. A meeting was arranged in Chicago at the office of Bair and Freeman, attorneys for Mr. Barker, which meeting was attended by Campbell, Barker, Bair and Mueller. At this meeting Campbell stated to Messrs. Bair, Barker and Mueller that the dates in his preliminary statement were wrong, that he had just discovered the error and that he wanted to correct it to square his conscience. At the meeting the affidavit, Defendants' Exhibit Q-6, was prepared and sworn to by Campbell, reciting inter alia that "I have just observed that the dates set forth in my preliminary statement in this case are erroneous and I hereby state the facts ex-

actly as they are." Campbell did not disclose this information or execute this affidavit in return for a promise by Messrs. Bair, Barker and/or Mueller that he would be paid for doing so, and did not at this meeting disclose that the dates in his preliminary statements were false and were known by him to be false at the time he executed the preliminary statement affidavits.

34. The attorneys for plaintiffs received the affidavit executed at Chicago, Defendants' Exhibit Q-6 and arranged a meeting at which they disclosed the affidavit to the attorneys for The Ashley Machine Company, which was then the owner of the Campbell application.

35. Thereafter the attorneys for The Ashley Machine Company made an independent investigation and concluded that they had no case in the interferences and on August 5, 1942 defaulted the same by permitting the time for taking testimony to expire.

36. Prior to the execution of the Campbell affidavit, Defendants' Exhibit Q-6, at Chicago on August 11, 1941, The Ashley Machine Company had been negotiating with plaintiffs for a license. These negotiations were conducted independently of the interferences. After The Ashley Machine Company concluded it had no case in the interferences it obtained a license under the Hunt invention, which license is Plaintiffs' Exhibit 11. This license was negotiated on a business basis independently of the interferences and the Campbell affidavits, and was for the same royalty payment to plaintiffs as that contained in the previously granted license to Barker Poultry Equipment Company.

37. In the making of the false affidavit, defendants' Exhibit Q-2; in approaching Mr. Barker and the plaintiffs, and in making the affidavit Defendants' Exhibit Q-6, Campbell was the instigator and the moving party at each step. No one took any advantage of Campbell. On the contrary, it appears Campbell attempted to take advantage of every one else with whom he came in contact in this affair.

38. Campbell testified at the present trial that the dates given in his preliminary

statement affidavit, Exhibit Q-2, were false and were known by him to be false when he executed the affidavit. In his affidavit, Defendants' Exhibit Q-6, executed at Chicago on August 11, 1941, which contains the information Campbell gave to Messrs. Bair, Barker and Mueller at the meeting in Chicago on that date, Campbell swears that he has just observed that the dates set forth in the preliminary statement, Defendants' Exhibit Q-2, are erroneous.

39. Plaintiffs did not use the information they had obtained from Campbell or the affidavit, Defendants' Exhibit Q-6, to intimidate any one or to force a settlement of the interferences on threat of exposure. Plaintiffs turned the information they had obtained and the affidavit, Defendants' Exhibit Q-6, over to the attorneys for The Ashley Machine Company, the owners of the Campbell applications, who were the attorneys handling the Campbell application in the interferences. The interferences were not settled or compromised. The attorneys for The Ashley Machine Company made their own independent investigation, and as a result concluded that they had no case in the interferences. The interferences were then defaulted by permitting the time to take testimony to expire.

40. The evidence in this case fails to establish the defendants' defense of unclean hands. The plaintiffs have not come into this Court or into this case with unclean hands.

41. Defendants do not have a license or an implied license under the Hunt patent-in-suit. No evidence was offered to sustain this defense.

42. Plaintiffs have not, with intent to deceive and defraud the public and to injure the defendants in their business, good will and reputation, maliciously and falsely published and circulated by advertisements, letters and oral statements to the trade and to the public and to suppliers of materials of defendants that defendants had infringed and were infringing the Hunt patent-in-suit with the object and purpose of intimidating and eliminating customers, prospective customers and suppliers of materials of the defendants. Defendants have failed to prove their counter-claim.

43. The licenses granted and taken under the Hunt patent were taken because of the merits of the invention and substantial royalties have been and are being paid for the use of the Hunt invention.

## Conclusions of Law.

1. The Hunt patent-in-suit, No. 2,300,-157, is not anticipated, discloses patentable invention and each of claims 2, 3, 7, 10, 12, 14, 17 and 19 of the patent is valid.

2. Claim 16 (The Method Claim) of the Hunt patent-in-suit is invalid.

3. Defendants, Harold C. Campbell and H. D. Thomas, have each infringed each of claims 2, 3, 7, 10, 12, 14, 17 and 19 of the patent-in-suit by making, using and selling and causing to be sold and used poultry picking machines illustrated in Plaintiffs' Exhibit 16. Defendant, William E. Ginovan, has infringed each of claims 2, 3, 7, 12, 14, 17 and 19 of Hunt patent-in-suit by using the machine illustrated in Plaintiffs' Exhibit 16.

4. The license agreements under the Hunt patent-in-suit and Plaintiffs' Exhibits 9, 10, 10-a, 11, 21, 21-a, and 61 are not in restraint of trade or in violation of the anti-trust laws; and do not constitute or involve any abuse of the patent right, or any attempt to control re-sale prices or to interfere with the exercise of any rights of the purchasers of the patent machines; and are not contrary to the public interest.

5. Plaintiffs do not come into this cause or this Court with unclean hands and the complaint should not be dismissed for unclean hands.

6. Defendants have failed to establish the defense of license or implied license under the patent-in-suit.

7. Defendants have failed to prove their counter-claim and it should be, and hereby is dismissed.

8. Except as to Claim No. 16 of the patent-in-suit, plaintiffs are entitled to the relief prayed for in their complaint.

9. Plaintiffs are entitled to their costs herein on all phases of the case.

Counsel may prepare and submit a decree accordingly.